UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CORNELIUS H. JACKSON,                          CIVIL NO. 11-0039 (MJD/JSM)

     Petitioner,

v.                                              **REPORT AND RECOMMENDATION**

JESSICA SYMMES, WARDEN,

     Respondent.


JANIE S. MAYERON, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge upon Cornelius H. Jackson's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. §2254 ("Petition") [Docket No. 1]. The matter was referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

## I.    **BACKGROUND**

On May 3, 2006, Christopher Lynch ("Lynch") and his cousin Jermaine Mack-Lynch ("Mack-Lynch") were walking to Charles Pettis' ("Pettis") house in North Minneapolis when they saw Petitioner Cornelius H. Jackson ("Petitioner"), Lamonte R. Martin ("Martin"), and Jonard McDaniel ("McDaniel") approach in a white Malibu. See State v. Jackson, 773 N.W.2d 111, 117 (Minn. 2009). Petitioner and Martin got out of the car and started chasing Lynch and Mack-Lynch. Id. Lynch and Mack-Lynch ran down an alley, and Lynch stopped because he was out of breath. Id. Mack-Lynch continued down the alley in an effort to draw Petitioner and Martin away from his cousin.

Id. Mack-Lynch reached Pettis' house and told him that "One Nines"[1] were chasing him. Id. Mack-Lynch and Pettis heard gunshots and observed Petitioner and Martin firing handguns into the backyard of a nearby house. Id. McDaniel pulled the car into the alley to pick up Petitioner and Martin, and the three drove away. Id. Mack-Lynch and Pettis found Lynch wounded in the backyard where the gunshots were fired. Id. Lynch was pronounced dead at the hospital; he had been shot 11 to 13 times. Id. at 116.

On June 1, 2006, Petitioner, Martin, and McDaniel were each indicted for first degree murder of Lynch and crime committed for the benefit of a gang pursuant to Minn. Stat. § 609.185(a)(1) and § 609.229, subd. 2. Jackson, 773 N.W. 2d at 116. The State motioned to join Petitioner, Martin, and McDaniel for trial, and the trial court granted the motion. Jackson, 773 N.W. 2d at 116; Appendix [Docket No. 7], pp. 1-10. McDaniel's case was severed for a separate trial. Jackson, 773 N.W. 2d at 116. On March 6, 2007, a jury convicted Petitioner of first degree intentional murder and crime committed for the benefit of a gang. Jackson, 773 N.W. 2d at 116. Petitioner was sentenced to life imprisonment without the possibility of release for his conviction of first degree intentional murder. Id. at 118; Trial Transcript ("Tr.") [Docket No. 9],[2] 2729-30. Petitioner appealed his conviction to the Minnesota Supreme Court, which affirmed the judgment on October 8, 2009. Jackson, 773 N.W. 2d at 127.

---

[1] "One Nines" is another name for the 19 Block Dipset gang to which Petitioner, Martin, and McDaniel belonged. See Jackson, 773 N.W.2d at 117. Mack-Lynch was a member of a rival gang, the Tre Tre Crips. Id. At trial, the State presented evidence that the murder of Lynch was "collateral damage" in an episode of gang related violence. Id.

[2] The Respondent provided the Court with excerpts of the transcript as part of its Appendix [Docket No. 7-1]. At the Court's request, Respondent has since provided the Court with the entire trial transcript.

On January 6, 2011, Petitioner filed a Petition for writ of habeas corpus under 28

U.S.C. ¶ 2254 alleging the following grounds for relief:

    (1)    The trial court abused its discretion in granting the State's motion for joinder of Petitioner and his codefendant's cases for trial.

    (2)    In violation of his right to due process, the trial court erred in denying Petitioner's request that he and codefendant Martin receive 30 peremptory challenges, or 15 per defendant, during jury selection .

    (3)    The district court erred in rejecting Petitioner's challenge under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) and sustaining the prosecutor's peremptory strike of a prospective juror.

    (4)    Petitioner was denied due process and a fair trial because of prosecutorial misconduct where the prosecutor asked questions of witnesses that were improper and made improper statements during closing argument.

    (5)    Petitioner's due process rights were violated when he was convicted of committing a crime for the benefit of a gang despite insufficient evidence to satisfy all of the elements of the crime.

    (6)    Petitioner's right to a fair trial was violated when Pettis, a state witness, was allowed to testify despite being present in the courtroom, in violation of a witness sequestration order, during the critical testimony of Mack-Lynch.

    (7)    Petitioner was denied due process and his right to present a full defense in violation of his Sixth Amendment rights when the district court refused to allow him to present to the jury a videotape of the crime scene, taken right after the shooting, which contained favorable evidence regarding statements made by the state's main witnesses regarding the view they allegedly had of the shooters from the front steps of and front yard of 701 N. Thomas Avenue.

Petition at pp. 5-14.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners.  Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Here, while Petitioner does not explicitly state whether he was proceeding under 28 U.S.C. § 2254(d)(1) or (2), it is evident from the substance of his Petition that he is raising challenges under both § 2254(d)(1) and (2).

The Court of Appeals for the Eighth Circuit has described the review under § 2254(d)(1) as follows:

> A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court "unreasonably applies"

> federal law when it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407.
>
> A federal court may not issue the writ simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

<u>Engesser v. Dooley</u>, 457 F.3d 731, 735-36 (8th Cir. 2006). Under this standard, the federal court "must deny a writ – even if we disagree with the state court's decision – so long as that decision is reasonable in view of all the circumstances." <u>May v. Iowa</u>, 251 F.3d 713, 716 (8th Cir. 2001) (<u>citing</u> <u>Williams</u>, 529 U.S. at 409-13).

By its terms, it is important to remember that § 2254(d)(1) "limits the benchmark precedent against which a habeas court may measure a state court decision to 'clearly established federal law, as determined by the Supreme Court of the United States.'" <u>O'Brien v. Dubois</u>, 145 F.3d 16, 20 (1st Cir. 1999), <u>overruled on other grounds</u>. Thus, even if lower federal court decisions support Petitioner's position, "the writ cannot issue unless the state court decision contravenes, or involves an unreasonable application of, extant Supreme Court jurisprudence." <u>Id.</u> Nevertheless, "[t]o the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." <u>Atley v. Ault</u>, 191 F.3d 865, 871 (8th Cir. 1999) (citing <u>O'Brien</u>, 145 F.3d at 25) ("If no Supreme Court precedent is dispositive of a Petitioner's claim, then, <u>a fortiori</u>, there is no specific rule to which the state court's decision can be 'contrary.' In such circumstances, a federal habeas court then determines whether the state court

decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable. To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue."); see also Engesser, 457 F.3d at 736-37 ("To the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue.") (citation and marks omitted).

Under § 2254(d)(2), a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record. 28 U.S.C. § 2254(e)(1). Pursuant to § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

With these standards of review in mind, this Court now turns to Petitioner's grounds for relief.

## III.   DISCUSSION

### A.   Ground One: Joinder of Petitioner and Codefendants

Ground 1 of the Petition provides "the trial court abused its discretion in granting the State's motion for joinder of Jackson and his codefendant's cases for trial." Petition,

p. 5. While Petitioner did not specify to this Court the constitutional basis for his challenge, he made two arguments to the trial court in opposition to the State's joinder motion. He first argued that his theory of the case rested upon "pointing the finger" at the other codefendants, and that this would force the jury to choose among irreconcilable defenses. See Appendix [Docket No. 7], p. 7. Additionally, Petitioner expressed concern that if the State called Renardo Smith[3] ("Smith") as a witness, Smith would testify that McDaniel told him that Petitioner shot Lynch. Id. Consequently, if McDaniel himself were to choose not to testify at Petitioner's trial, his statement to Smith would violate the Sixth Amendment's Confrontation Clause[4] as explained in Bruton v. U.S., 391 U.S. 123 (1968).[5] Id. at pp. 7-8.

In his appeal to the Minnesota Supreme Court, Petitioner argued that the joint trial of him and Martin denied Petitioner of his due process right to a fair trial. Appendix [Docket No. 7], p. 18.

In opposition, Respondent contended that Petitioner was not prejudiced by the trial court's decision to grant joinder of Petitioner with Martin. Respondent's Memorandum ("Resp. Mem.") [Docket No. 6], p. 7. Respondent argued that Petitioner would not have been acquitted had he been tried separately from Martin because Petitioner's defense would not have materially changed, and witness testimony used to

---

[3]      Smith was alleged to be a member of the Vice Lords gang, of which the 19 Block Dipset gang was an "offshoot." Tr. 1642. Smith testified that Petitioner, Martin, and McDaniel were members of the 19 Block Dipset gang. Tr. 1642-43.

[4]      "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.

[5]      Bruton held that where a codefendant's confession was admitted at joint trial and codefendant did not take the stand, defendant was denied his constitutional right of confrontation. See Bruton, 391 U.S. at 127-28.

convict Petitioner would have been admitted anyway. Id., pp. 7-8. Respondent further submitted that any admissions made by Petitioner and Martin at trial were redacted to avoid inculpating each other as the shooter of Lynch, which prevented any violation of the Sixth Amendment's Confrontation Clause. Id., p. 8. Respondent also asserted that the nature of the offense favored joinder because Petitioner and Martin acted in close concert with one another, both were charged with the same crimes, and the prosecution's evidence against both Petitioner and Martin was nearly identical. Id., pp. 8-9. Respondent added that the impact on witnesses, which included the victim's cousin and a 10-year-old boy, necessitated joinder in this case because of the trauma that would result from the witnesses testifying at multiple trials. Id., pp. 9-10. Further, joinder was appropriate because Petitioner and Martin did not advance antagonistic defenses that would force the jury to choose between two conflicting theories of the facts since neither codefendant attempted to shift the blame to the other. Id., pp. 10-11. Finally, Respondent maintained that the interests of justice favored joinder given that multiple trials would be a tedious process, and many witnesses were gang members that might not be available to testify at multiple trials. Id., pp. 13-14.

The trial court granted the State's motion to join Petitioner, Martin, and McDaniel[6] because "there [was] not sufficient evidence of antagonistic defenses to support a finding of prejudice against any of the three defendants on that basis." Appendix [Docket No. 7], p. 7. The Minnesota Supreme Court upheld the trial court's decision, finding not only that the nature of the offenses, the impact on the eyewitnesses, lack of evidence of antagonistic defenses, and interests of justice favored joinder, but there

---

[6]     Ultimately, McDaniel was tried separately.

was no substantial prejudice to Petitioner resulting from the joinder.  <u>Jackson</u>, 773 N.W. 2d at 118-119.

"[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  <u>Zafiro v. U.S.</u>, 506 U.S. 534, 539 (1993); <u>see</u> <u>also</u> <u>Hood v. Helling</u>, 141 F.3d 892, 896 (8th Cir. 1998) (citing <u>Jenner v. Class</u>, 79 F.3d 736, 741 (8th Cir. 1996), <u>cert.</u> <u>denied</u>, 519 U.S. 874 (1996)) ("A habeas petitioner is not entitled to relief on the grounds that he was entitled to a severance unless he can show that a joint trial was fundamentally unfair."); <u>see</u> <u>also</u> <u>Robinson v. Wyrick</u>, 735 F.2d 1091, 1094 (8th Cir. 1984) ("To obtain federal habeas corpus relief, the joinder 'must actually render petitioner's state trial fundamentally unfair and hence, violative of due process.'" (quoting <u>Tribbitt v. Wainwright</u>, 540 F.2d 840 (5th Cir. 1976)), <u>cert.</u> <u>denied</u>, 469 U.S. 983 (1984).  "Because defendants who are jointly indicted on similar evidence from the same or related events should, in most instances, be tried together,[7] a defendant seeking severance must show 'real prejudice,' that is, 'something more than the mere fact that he would have had a better chance for acquittal had he been tried separately.'" <u>U.S. v. Blaylock</u>, 421 F.3d 758, 766 (8th Cir. 2005) (quoting <u>U.S. v. Oakie</u>, 12 F.3d 1436, 1441 (8th Cir.1993)), <u>cert.</u> <u>denied</u>, 546 U.S. 1126 (2006).  "A defendant can show real prejudice either by showing that his or her defense is irreconcilable with the co-defendant's defense 'or that the jury will be unable to compartmentalize the evidence as

---

[7]    "[A] joint trial 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'"  <u>U.S. v. Darden</u>, 70 F.3d 1507, 1528 (8th Cir. 1995) (quoting <u>U.S. v. Buljubasic</u>, 808 F.2d 1260, 1263 (7th Cir. 1987)), <u>cert.</u> <u>denied</u>, 474 U.S. 980.

it relates to separate defendants.'" U.S. v. Abfalter, 340 F.3d 646, 652 (8th Cir. 2003) (quoting U.S. v. Gutberlet, 939 F.2d 643, 645 (8th Cir. 1991)).  Defenses are irreconcilable when they conflict such that "'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" U.S. v. Jones, 880 F.2d 55, 63 (8th Cir. 1989) (quoting U.S. v. Bruno, 809 F.2d 1097, 1103 (5th Cir. 1987), cert. denied, 481 U.S. 1057 (1987)).  However, that "[m]utually antagonistic defenses are not prejudicial *per se*," and "the tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion." Zafiro, 506 U.S. at 538-539 (citing U.S. v. Lane, 474 U.S. 438, 449 n.12 (1986)).

This Court finds that the decision of the Minnesota Supreme Court affirming the joinder of Petitioner and Martin for trial was neither contrary to, nor an unreasonable application of, clearly established federal law.  The factual record shows that Petitioner was not substantially prejudiced by the joint trial.  Smith never testified that McDaniel accused Petitioner or Martin of shooting Lynch.  Tr. 1642-1648.  McDaniel was not a witness against Petitioner, and the Confrontation Clause was not compromised. Further, the record shows that Petitioner did not implicate or "point the finger" at Martin as the real shooter of Lynch.  Tr. 2329-2373, 2379-2395, 2407-2432.  The jury was not forced to decide between conflicting characterizations of the facts, and therefore, Petitioner's defense was not irreconcilable with Martin's defense.

Additionally, because Petitioner cannot show that he suffered "real prejudice" as a result of the joinder, Petitioner's claim that he was denied due process or that his constitutional right of confrontation was violated based on the trial court's granting of the State's motion for joinder, should be dismissed with prejudice.

### B.     Ground Two: Refusal of Additional Peremptory Challenges

Ground 2 of the Petition states that Petitioner's right to due process was violated when the trial court denied his request that he and codefendant Martin receive 30 peremptory challenges, or 15 per defendant, during jury selection.[8]   Petition, p. 6.   In support of his claim, Petitioner stated, "Minnesota Statutes provide that when an individual is charged with an offense punishable by life imprisonment, the defendant is entitled 15 peremptory challenges."   Id.

The Minnesota Supreme Court upheld the trial court's determination, stating:

> Under Minn. R. Crim. P. 26.02, subd. 6, Jackson and codefendant Martin were entitled to 15 peremptory challenges. The rule uses permissive language, placing the matter within the discretion of the district court . . . . And the district court was not required, without more, to grant each defendant the same number of peremptory challenges they would have had in a separate trial in order to ensure a fair jury.

Jackson, 773 N.W.2d at 120.

Respondent submitted that under Minnesota law, the court has discretion in a case of multiple defendants on whether to grant additional peremptory challenges beyond the 15 statutorily allotted challenges.   See Resp. Mem., pp. 14-15.   Respondent further stressed that Petitioner was not prejudiced by the trial court's decision because Petitioner and Martin did not exhaust their peremptory challenges during jury selection. Id., p. 16.

"The right to exercise peremptory challenges in state court is determined by state law."   Rivera v. Illinois, 556 U.S. 148, 152 (2009) (unanimous decision); see also Ross v. Oklahoma, 487 U.S. 81, 89 (1988) ("it is for the State to determine the number of

---

[8]     Petitioner and Martin were each issued 10 peremptory challenges for a total of 20 peremptory challenges.  Appendix [Docket No. 7], p. 40.

peremptory challenges allowed and to define their purpose and the manner of their exercise."). "[P]eremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial." Georgia v. McCollum, 505 U.S. 42, 57 (1992); see also Ross, 487 U.S. at 88 (citations omitted) ("[P]eremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury."). "States are free to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error . . . ." Rivera, 556 U.S. at 162. In fact, "States may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.'" Rivera, 556 U.S. at 152 (quoting McCollum, 505 U.S. at 57).

Where the United States Supreme Court has pronounced that peremptory challenges are an issue of state law, it is not for this Court to disagree with the Minnesota Supreme Court's decision on this matter. Besides, even if Petitioner had been entitled to 15 peremptory challenges, he can show no prejudice because he only used eight peremptory challenges during jury selection. Tr. 95, 104, 110, 122, 192, 195, 704, 723.

This Court finds that the Minnesota Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, Petitioner's claim that the trial court abused its discretion and denied him due process by refusing to give him additional peremptory challenges should be dismissed with prejudice.

**C.  Ground Three: Denial of Batson Challenge**

Ground 3 provides "[t]he district court erred in rejecting [Petitioner]'s challenge under Batson v. Kentucky, 476 U.S. 79 (1986), and sustaining the prosecutor's peremptory strike of a prospective juror." Petition, p. 8. In support of Ground 3, Petitioner stated the following:

> During jury selection, the State exercised a preemptory challenge to excuse juror number 43. Juror number 43 was the first juror of color stricken by the use of a preemptory challenge. Defense counsel made a Batson challenge and the district court initially found that the State had stricken juror 43 in a manner that raised an inference of exclusion based upon race and that the State failed to articulate and race-neutral explanation and therefore denied the request for a preemptory challenge. The State's articulated reason for the preemptory challenge was that Juror 43 had stated concerns about whether African Americans and/or minorities received the same treatment in the court system as non-minorities. After allowing the State to voir dire Juror 43, the district court reversed itself and allowed the preemptory strike based upon Juror having had a cousin who had been convicted of maltreatment of a child. However, six of the jurors selected either had been arrested or charged criminally themselves or had close family members who had been arrested or charged criminally and a Caucasian juror who expressed similar views to the stricken juror was accepted by the State.[9]

Petition, p. 8.

In essence, Petitioner believed that because the prosecutor's reasons for striking Juror 43 – i.e., Juror 43 had a cousin who had been convicted of a crime – were common to other accepted jurors, they were pretext for racial discrimination. Id.

In his appeal to the Minnesota Supreme Court, Petitioner argued that the state's peremptory strike of juror 43 was a pretext for racial discrimination. See Appendix

---

[9]  Both Petitioner and Juror 43 were African American. See Appendix [Docket No. 7], p. 116.

[Docket No. 7], p. 32. He also asserted that the trial court's decision to allow the state's peremptory strike was in error because the court's findings were based on the state's arguments, which mischaracterized Juror 43's answers, as opposed to the juror's actual answers; the trial court disregarded Juror 43's statements that he did not have negative feelings toward the criminal justice system and that he would not have any trouble being fair and impartial despite the fact that he wondered whether the system was always fair to minorities; and the trial court had no business allowing the prosecutor to strike Juror 43 based on the court's and the prosecutor's concern that the juror worked with the victim's uncle, even though the victim's uncle had spoken highly of Juror 43, they had barely any contact with each other, and could base a verdict on the evidence and not on the work relationship. Id., pp. 37-39.

Referencing the reasons stated in its decision issued in codefendant Martin's case on the same day as it issued its decision on Petitioner's appeal, the Minnesota Supreme Court "concluded that the district court properly followed the Batson analysis, and that its decision to sustain the peremptory challenge [was] not clearly erroneous." Jackson, 773 N.W.2d at 120. In Martin, the Minnesota Supreme Court described the Batson challenge by both Martin and Petitioner[10] as follows:

> Juror 43, an African–American male, was the first African–American juror to be interviewed during voir dire of the venire. Initially, the district court asked him questions regarding his answer to a juror questionnaire about his opinions of the criminal justice system, where he wrote, "Do African American/minorities receive the same treatment as nonminorities?" He explained that he questioned whether people of color are "being treated equally when there is a hearing and when punishment or time to be served is fair."

---

[10]    Martin initially made the Batson challenge, (Tr. 806), and Petitioner joined in the challenge and the arguments made by Martin's counsel in support of the challenge. Tr. 817, 830.

He believed that people of color received harsher punishments and may not receive fairness and equal treatment. He further stated, however, that his concerns would not affect his ability to be a fair and impartial juror. He admitted that he had a cousin who may have been wrongfully convicted of a crime. He also acknowledged that his coworker was the uncle of Lynch.

The prosecutor exercised a peremptory challenge to Juror 43. The defense asserted a Batson challenge. The prosecutor responded that the juror was struck because he did not feel that the criminal justice system treated minorities fairly, he believed that persons of color receive harsher punishment, his relatives believed that his cousin was wrongfully convicted of a crime, and the victim's aunt told the prosecutor that Juror 43 "might not be a good person for the case." The district court denied the peremptory challenge on the ground that the State failed to satisfy the second Batson prong, requiring it to articulate a race-neutral explanation for striking the juror.

The prosecutor then questioned Juror 43. The juror testified that his cousin's conviction involved a dispute between his cousin and his cousin's girlfriend over who was responsible for injuries suffered by his cousin's child. Based on the opinion of his relatives, he concluded that it was possible his cousin was wrongfully convicted. Also, he had conversations with undisclosed people who said that minorities are incarcerated for a longer length of time for certain crimes than nonminorities. He stated, "Am I taking it as a fact? No. But it is something that stays in my mind."

Subsequently, the prosecutor renewed his peremptory challenge. Based on its analysis of the second and third prongs of Batson, the district court sustained the peremptory challenge. The court concluded that the reasons given by the prosecutor were race neutral, and that the prosecutor did not show any evidence of racial bias.[11]

---

[11]    The trial court's reasoning behind its finding that the reasons given by the prosecutor were race neutral, and that the prosecutor did not show any evidence of racial bias was as follows:

A comparative juror analysis in this case reveals that this fails to demonstrate purposeful discrimination. In analyzing two questions in the juror questionnaire that serves as the race-neutral basis for the prosecution's strike, this Court

15

notes the following with regard to the seven jurors already selected by all parties in this case. With regard to the question about whether the juror or anyone he or she knows has been accused, arrested, placed under investigation or convicted of a crime, one of the seven jurors said that his son had been convicted of illegal possession of prescription drugs and he felt that his son had been treated very fairly. Another juror said that her ex-husband was in custody for crimes committed before she met him and about which she knew nothing when she was married to him having learned of the crimes only through her children and another juror had an underage drinking and driving conviction while in college and has had friends who have been charged with minor consumption and DWI's. None of these jurors expressed concern about whether the Criminal Justice System treated the offenders fairly. With regard to the question in the juror questionnaire about whether the prospective juror feels that the Criminal Justice System is fair and whether the juror has any specific concerns about the Criminal Justice System as it relates to persons of color, only one other juror expressed concern. Juror No. 14, who is married to an African American man stated that she thinks the Criminal Justice System is fair and has specific concerns that it is biased against people of color. However, this juror responded in the questionnaire that she thinks the jury system in this country is a fair system. Whereas, [Juror No. 43] responded that he does not think the jury system in this country is a fair system. Comparing [Juror No. 43]'s response to this question to all of the seven jurors already selected to sit on the jury he is the only juror who answered this question in this way. On the basis of comparative juror analysis, again, the defendant's, [sic] as I noted earlier, have failed to demonstrate purposeful discrimination.

In regard to [Juror No. 43]'s oral answers during voir dire, the Court found that [Juror No. 43] was not forthcoming with information, especially in regard to his opinions that the Criminal Justice System is unfair to African Americans and minorities, and in regard to the extent of his knowledge about his cousin's conviction and resulting prison term and the facts involved in his cousin's case, for a person employed with the Hennepin County Child Protection Department, he seemed to know surprisingly little about the facts involved in his cousin's case, a case prosecuted in Hennepin County. Yet, at the same time, solely from speaking with his aunt and uncle, he seemed to believe that

<u>State v. Martin</u>, 773 N.W.2d 89, 101-02 (Minn. 2009) (footnotes omitted).  In affirming

the trial court's decision, the Minnesota Supreme Court explained:

> Based on its review of <u>Batson</u>, the district court concluded
> that the prosecutor articulated a race-neutral explanation for
> striking the juror in question, and that Martin failed to carry
> his burden of proving purposeful discrimination. The court
> supported its conclusions with findings that the responses of
> Juror 43 about the fairness of the criminal justice system
> toward African Americans and his cousin's conviction were
> not "forthcoming." The district court noted that Juror 43 did
> not provide specific reasons or facts underlying his views on
> these subjects. And the district court expressed concern that
> Juror 43 believed that his cousin may have been wrongfully
> convicted, and the juror worked with the victim's uncle. On
> this record, we cannot say that the findings of the district
> court are clearly erroneous.
>
> We have consistently held that a family member's
> involvement with the legal system is a legitimate race-neutral
> reason for the State to exercise a peremptory challenge.
> <u>Bailey</u>, 732 N.W.2d at 619–20[12] (upholding a peremptory
> challenge against a "juror of color" because of
> inconsistencies in her answers about her brother-in-law's
> conviction for domestic abuse and because some of
> answers seemed to indicate she might feel a "kinship" with
> the defendant); <u>Gomez</u>, 721 N.W.2d at 884[13] (upholding

---

> his cousin may have been wrongfully accused and
> wrongfully convicted. Additionally, this Court has concerns
> about the fact that [Juror No. 43] works in directly with
> someone who is the uncle of the decedent in this case.
> Although [Juror No. 43] does not work directly with the uncle
> and apparently sees little of him because he and the uncle
> office on different floors, they have had a past occasion to
> spend eight to ten hours in an automobile traveling to and
> from Bemidji for work and [Juror No. 43] acknowledged that
> they do occasionally run into each other at work.

Tr. 839-842.

[12]    <u>State v. Bailey</u>, 732 N.W.2d 612 (Minn.2007).

[13]    <u>State v. Gomez</u>, 721 N.W.2d 871 (Minn. 2006).

peremptory challenge because potential juror indicated her father had been tried and convicted for sexually abusing her half-sister and that she thought her father was wrongfully convicted); Reiners, 664 N.W.2d at 830–32[14] (upholding a peremptory challenge against an African–American woman because of her "significant exposure to law enforcement" from her father's job as a police officer in Atlanta and her participation in police training while in high school). Here, the juror's belief that his cousin may have been wrongfully convicted and the fact that the juror worked with the victim's uncle were race-neutral reasons for excluding the juror.

We conclude that the district court properly followed the Batson analysis, and that its decision to sustain the peremptory challenge is not clearly erroneous. Therefore, we affirm the district court.

Id. at 103-04.

When a defendant brings a challenge to a prosecutor's use of peremptory strikes under Batson, the Equal Protection Clause is implicated:

Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his view concerning the outcome of the case to be tried, the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.

Batson, 476 U.S. at 89 (citations omitted) (internal quotation marks omitted). "A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing[15]

---

[14]    State v. Reiners, 664 N.W.2d 826 (Minn. 2003).

[15]    "[A] defendant [can] make out a prima facie case of discriminatory jury selection by the totality of the relevant facts about a prosecutor's conduct during the defendant's own trial."  Miller-El v. Dretke, 545 U.S. 231, 239 (2005) (internal quotation marks omitted) (citing Batson, 476 U.S. at 94, 96).

that the prosecutor exercised a peremptory challenge on the basis of race."[16]  Rice v. Collins, 546 U.S. 333, 338 (2006) (citing Batson, 476 U.S. at 96-97).   "Second, if the [prima facie] showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question."  Rice, 546 U.S. at 338 (citing Batson, 476 U.S. at 97-98).[17]   "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination."  Id. (citing Batson, 476 U.S. at 98).  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor . . . ."  Id. (quoting Purkett, 514 U.S. at 768); see also Snyder v. Louisiana, 552 U.S. 472, 477 (2008) (citation omitted) ("Step three of the Batson inquiry involves an evaluation of the prosecutor's credibility . . . ."); Miller-El,

---

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances.  For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination.  Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.  These examples are merely illustrative.

Batson, 476 U.S. at 96-97.

[16]    This Court notes that while Batson held that the defendant must show that the prosecutor exercised peremptory challenges to exclude members of the defendant's own race, see 476 U.S. at 96, the Supreme Court has since decided that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races," Powers v. Ohio, 499 U.S. 400, 402 (1991).

[17]    "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices."  Rice, 546 U.S. at 338 (quoting Purkett v. Elem, 514 U.S. 765, 767-768 (1995) (per curiam)); see also Batson, 476 U.S. at 97 ("[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.").

545 U.S. at 252 ("the judge [must] assess the plausibility of [the prosecutor's] reason in light of all evidence with a bearing on it."). "Pretext [for discrimination] can be shown by evidence that non-stricken white panel members share the characteristics of a stricken minority panel member." U.S. v. Jenkins, 52 F.3d 743, 747 (8th Cir. 1995) (citing Davidson v. Harris, 30 F.3d 963, 965 (8th Cir. 1994). "'The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768).

On direct appeal of a Batson claim, "[t]he trial court's determination is entitled to great deference . . . ."[18] Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (internal quotation marks omitted) (citing Batson, 476 U.S. at 98). The decision "'must be sustained unless it is clearly erroneous.'" Id. (quoting Snyder, 552 U.S. at 477). Moreover, on federal habeas review, the "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)).

In this case, Petitioner claims that the trial court reversed its initial decision to deny the prosecution's preemptory strike of Juror 43 and subsequently allowed the

---

[18]    The Supreme Court explained its deferential treatment of trial court decisions on the Batson issue:

> [T]he best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.   In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance . . . . [T]hese determinations of credibility and demeanor lie peculiarly within a trial judge's province and  .  .  . in the absence of exceptional circumstances, we would defer to [the trial court].

Snyder, 552 U.S. at 477 (citations omitted) (internal quotation marks omitted).

preemptory strike based upon Juror 43 having had a cousin who had been convicted of maltreatment of a child. Petition, p. 8. According to Petitioner, six of the jurors selected either had been arrested or charged criminally and a Caucasian juror who expressed similar views to the Juror 43 was accepted by the State.[19] Id.

Ground 3 is rejected for several reasons. As a preliminary matter, the argument Petitioner is now making in the habeas petition was never presented to the Minnesota Supreme Court in support of his Batson challenge.[20] See Appendix [Docket No. 7], pp. 45-55; see also Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005) ("Presenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement.").

Second, the trial court's decision to permit the peremptory strike was not based solely on the fact that Juror 43 had a cousin who had been convicted of a crime. Rather, the decision was based on numerous factors including that Juror 43 responded in his questionnaire that he did not think the jury system in this country is a fair system; Juror 43 was not forthcoming in his oral answers during his voir dire regarding his opinions that the criminal justice system is unfair to African Americans and minorities, and regarding the extent of his knowledge about his cousin's conviction; and despite his

---

[19]    Petitioner did not cite to the trial record to support this contention. The Court's review of over 1000 pages in the record indicates there are no other jurors with similar circumstances to Juror No. 43. Juror No. 14 stated that she had seen prejudice against African Americans, in the form of her husband, who is African American, being stopped frequently in Thief River Falls, Minnesota for speeding. Tr. 240. There was no mention that she believed that the jury system was unfair. The trial judge discussed two jurors in her decision on the Batson challenge who had relatives convicted of a crimes, but did not indicate which jurors she was referencing. See footnote 11, supra.

[20]    At most, Petitioner argued that there was nothing about Juror 43 that differed significantly from the other jurors who had already been selected to serve on the jury. Appendix [Docket No. 7], p. 54.

lack of knowledge of this cousin's conviction, Juror 43 stated that solely from speaking with his aunt and uncle, he seemed to believe that his cousin may have been wrongfully accused and wrongfully convicted.[21]  Tr. 841.

---

[21]     During voir dire, the trial court questioned the Juror 43 as follows:

> Court: I'm having some difficulty understanding one of your responses, and it may just be because I'm just not reading it the way you intended it to be understood. You were asked what your opinions or concerns are about the criminal justice system as you know it, and I'm just going to read your response to you. It says, do African Americans/minorities receive the same treatment as non-minorities?
>
> Juror: Correct.
>
> Court: Are you asking the question?
>
> Juror: I guess I am asking that question. I mean, that is one of the questions that I always have. Are they being treated equally when there is a hearing and when punishment or time to be served is fair.
>
> Court: What do you think?
>
> Juror: Because I'm not an expert, I can't really be specific.
> Court: All right. Well, as a non-expert, do you have any sense about whether or not the criminal justice system is fair or unfair to African Americans or other persons of color?
>
> Juror: I think if the punishment fits the crime, I'm in agreement with that, but I don't know the laws and I can't really say if the punishment fits the crime.
>
> Court: Do you think that just generally as a non-expert that persons of color are receiving harsher punishments?
> Juror: Yes.
>
> Court: And that would seem to be - tie in with your concern about fairness and equal treatment?
>
> Juror: Yes.

Third, no evidence was presented by Petitioner to show that the comparative analysis performed by the trial court showed that Juror 43's responses were no different than the other six jurors who also had contact with the legal system. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller–El, 545 U.S. at 241. The trial court found to the contrary, noting that Juror 43 was the only juror in his questionnaire who did not think the jury system in this country is a fair system. Id. Further, Juror 43 was the only juror who worked with a relative of the decedent.

Juror 43's responses were unique compared to the other accepted jurors, and therefore, the prosecutor's use of a peremptory challenge was not a proxy for racial discrimination.

---

Court: In the child protection area, do you think that there are similar concerns?

Juror: I think that it depends on who the judge may be. The judge orders things differently. One judge may be a little more harsh than others, and I guess that depends on their expertise in working with those families.

Court: Okay. So, you know, do you think that there perhaps is some disparate treatment based on race?

Juror: Yes.

Court: Do you believe that your perceptions about the criminal justice system and its equal or unequal treatment of persons of color would affect your ability to be a fair and impartial juror if selected as a juror in this case?

Juror: No.

Tr. 780-82.

For all of these reasons, this Court finds that the Minnesota Supreme Court's affirmation of the trial court's decision was neither contrary to clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, this Court recommends that Petitioner's claim that the trial court erred in rejecting Petitioner's <u>Batson</u> challenge be dismissed with prejudice.

### D.     <u>Ground Four: Prosecutorial Misconduct</u>

Ground 4 states that Petitioner "was denied Due Process and a fair trial because of prosecutorial misconduct where the prosecutor asked questions of witnesses that [were] improper and made improper statements during closing argument." Petition, p. 9. Petitioner alleged that the prosecutor asked witnesses questions designed to elicit inadmissible evidence, such as asking a witness, Pettis, whether there was danger in testifying; asking witnesses whether Petitioner's friends had tried to intimidate them; and asking witnesses about "gangsters." <u>Id.</u>, p. 10. Petitioner also claimed that the prosecutor made inappropriate statements and improperly stated the law during closing argument, including by way of example, telling the jury that people are convicted all of the time, even with the presumption of innocence; telling the jury it would be an unspeakable injustice to convict of a lesser included offense; telling the jury that they would be naïve if they did not convict; telling the jury that murders, just like the one in this case, happen on the streets of North Minneapolis, and "welcome to the streets of North Minneapolis;" and asking if the jurors thought the defendants were boy scouts. <u>Id.</u>

The United States Supreme Court has held that "judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.'" <u>Chapman v. California</u>, 386 U.S. 18, 22 (1967) (quoting 28 U.S.C. § 2111), <u>overruled on other</u>

grounds by <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).  "[A] reviewing court finding

[due process] error should ask whether the flaw . . . 'had substantial and injurious effect

or influence in determining the jury's verdict.'"[22]  <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 58

(2008) (per curiam) (citing <u>Brecht</u>, 507 U.S. at 623).

---

[22]     This standard, known as the <u>Brecht</u> harmless-error standard, has effectively
replaced the previous harmless-error standard espoused in <u>Chapman</u>, which held that
"before a federal constitutional error can be held harmless, the court must be able to
declare a belief that it was *harmless beyond a reasonable doubt.*"  386 U.S. at 24
(1967) (emphasis added).    However, certain types of error, which Chief Justice
Rehnquist called "structural defects," "defy analysis by harmless-error standards.  The
existence of such defects – deprivation of the right to counsel, for example – requires
automatic reversal of the conviction because they infect the entire trial process."
<u>Brecht</u>, 507 U.S. at 629-30 (internal quotation marks omitted) (citing <u>Arizona v.
Fulminante</u>, 499 U.S. 279, 307-09 (1993)).

> The opinion in <u>Brecht</u> clearly assumed that the [harmless-
> error] standard would apply in virtually all § 2254 cases. It
> suggested an exception only for the unusual case in which a
> deliberate and especially egregious [structural] error . . .
> infect[s] the integrity of the proceeding.

<u>Fry v. Pliler</u>, 551 U.S. 112, 117 (2007) (internal quotation marks omitted) (citing <u>Brecht</u>,
507 U.S. at 638).

In the present case, the Minnesota Supreme Court explained the standard of
review it would apply depended on whether an objection was made at trial.

> When an objection is made and we conclude the prosecutor
> committed misconduct, we apply a two-tiered harmless-error
> analysis. Specifically, in cases involving unusually serious
> prosecutorial misconduct, we review the conduct to
> determine whether it was harmless beyond a reasonable
> doubt. For less-serious misconduct, we review the conduct
> to determine whether it likely played a substantial part in
> influencing the jury to convict.

> When an objection is not made to alleged prosecutorial
> misconduct, we review under a modified plain-error test. The
> defendant must prove an error was made that was plain. If
> plain error is established, the burden shifts to the
> prosecution to demonstrate that the error did not affect
> substantial rights. An error affects a defendant's substantial

"[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  Fry, 551 U.S. at 119 (emphasis in original) (citing Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (per curiam)).  Furthermore, "even if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law . . . [habeas courts] must apply Brecht's harmless-error analysis, unless the error was a structural defect in the trial that defies [such] analysis."[23]  Toua Hong Chang v. Minnesota, 521 F.3d 828, 832 (8th Cir. 2008) (citing Brecht, 507 U.S. at 629), cert. denied, 555 U.S. 931 (2008); see also Inthavong v. La

---

rights only if there is a reasonable probability that the error actually impacted the verdict. If these three prongs are met, the [appellate] court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings.

Jackson, 773 N.W.2d at 121-22 (citations and internal quotation marks omitted).  The Court notes that while the defense objected with regards to the questions to witnesses, the defense did not object to the alleged prosecutorial misconduct during closing statements

Even though the Minnesota Supreme Court reviewed the prosecutor's actions under the Chapman harmless-beyond-a-reasonable-doubt standard as to the issue of the prosecution's questioning of witnesses (see Jackson, 773 N.W.2d at 122-125), "for reasons related to the special function of habeas courts, [this Court] must review such error (error that may require strict review of the Chapman-type on direct appeal) under the [Brecht] standard."  California v. Roy, 519 U.S. 2, 6 (1996) (per curiam).

[23]    The Supreme Court has not resolved the matter of whether the AEDPA subsumes the Brecht standard, or if the two act in conjunction.  The Supreme Court stated in Fry that while the AEDPA has not replaced Brecht, lower courts are not required to implement both tests since Brecht encompasses the AEDPA.  See 551 U.S. at 119-20.  Although the Sixth Circuit has held that Brecht's "determination of whether an error had a 'substantially injurious' effect on the jury's verdict is broader and thus 'subsumes' the question whether the state court reasonably applied Chapman," Ruelas v. Wolfenbarger, 580 F.3d 403, 412 (6th Cir. 2009), the Eighth Circuit recently opined that the Brecht test applies *after* the AEDPA determination of unreasonableness.  See Toua Hong Chang, 521 F.3d at 832.

Marque, 420 F.3d 1055, 1059 (9th Cir. 2005) ("To grant relief where a state court has determined that a constitutional error was harmless, we must both determine (1) that the state court's decision was 'contrary to' or an 'unreasonable application' of Supreme Court harmless error precedent, and (2) that the Petitioner suffered prejudice under Brecht from the constitutional error."), cert. denied, 547 U.S. 1059 (2006).

The Eighth Circuit test for prosecutorial misconduct is as follows:

> 1) the prosecutor's remarks or conduct must have been improper; and 2) such remarks or conduct must have prejudicially affected defendant's substantial rights so as to deprive him of a fair trial . . . If this court reaches the second step, the factors we consider are: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence of the defendant's guilt; and 3) any curative actions taken by the trial court.

U.S. v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000) (citations omitted). "[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Parker v. Matthews, 132 S. Ct. 2148, 2153 (2012) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)).

### 1.    Questions to Witnesses

In its review of Petitioner's conviction, the Minnesota Supreme Court held that any misconduct that may have resulted from the prosecutor asking Pettis if he was in danger from testifying and using the term "gangster" instead of "gang member" in one question was harmless beyond a reasonable doubt because Jackson objected to the prosecutor's questions, the objections were sustained, the jury was given a curative

instruction, and there was overwhelming evidence of Petitioner's guilt.[24]  See Jackson, 773 N.W.2d at 122.  The record supports this holding.  See Tr. 1498-1500; 1577-78, 1619, 1667, 2680.

Based on the record, this Court concludes that the prosecutor's conduct did not have a substantial and injurious effect in determining the jury's verdict because the jury was instructed to ignore the prosecutor's improper questions and the verdict was well supported by the record.[25]  See Greer v. Miller, 483 U.S. 756, 766 (1987) (holding that an improper question from the prosecutor followed by an immediate objection and remedial court instructions did not violate the defendant's due process rights).  The Court finds no reversible error as to this issue.

## 2. Closing Argument

This Court finds that the prosecutor did not misstate or attempt to lower the State's burden of proof during closing argument.  On this issue, the Minnesota Supreme Court found:

> Jackson next contends that the prosecutor attempted to reduce the State's burden of proof. Specifically, the prosecutor told jurors that "when liberty interests are at stake it's only fair" that the burden rest with the prosecution, but even with the presumption of innocence, many people are still convicted and that proof beyond a reasonable doubt was "a stiff burden." Jackson did not object. We have not previously decided whether it is improper for a prosecutor to state that, even with the presumption of innocence, many

---

[24] The State's evidence included the testimony of two eyewitnesses that after hearing gunshots (one of them saw Petitioner shooting), they observed Petitioner and Martin enter a white car and drive away from the backyard where Lynch was shot, and a ten-year-old boy witnessed the shooting from his back porch and corroborated this testimony.  Tr. 1498-1500; 1576-78, 1787-93.

[25] "[I]n all cases, juries are presumed to follow the court's instructions."  CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009) (citing Greer, 483 U.S. at 767 n.8).

> people are convicted. We conclude that the prosecutor's argument did not misstate the burden of proof or shift the burden of proof; rather, it was a legitimate explanation of the State's burden. Thus, we see no error, let alone plain error.

Jackson, 773 N.W.2d at 122-23 (citation omitted).

"The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 425 U.S. 501, 503 (1976). Further "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). "The Government must prove every element of the offense charged beyond a reasonable doubt . . . ." Old Chief v. U.S., 519 U.S. 172 (1997) (citation omitted). "[T]he prosecution may not improperly suggest that the defendant has the burden to produce evidence." U.S. v. Swift, 623 F.3d 618, 623 (8th Cir. 2010) (marks and citations omitted).

The prosecutor used plain statements of fact to describe an intricate standard of law to an unfamiliar jury, and therefore, the Minnesota Supreme Court's determination was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of facts in light of the evidence presented at trial. In addition, the prosecutor told the jury that anything he said that was contrary to the law the judge gave should be disregarded, and that the jury could not base its verdict on a closing argument. Tr. 2494-95. The prosecutor also reminded the jury that the state had "the burden beyond a reasonable doubt as to each and every element in the offenses. . . ." Tr. 2495. Further, the trial court instructed the jury that Petitioner had the presumption of innocence, the state had the burden to prove all the essential

elements of each charged crime, and Petitioner had no burden to prove his innocence. Tr. 2680. Thus, the allegedly improper comments by the prosecutor about the burden on the prosecutor or the presumption of innocence did not have had a substantial and injurious effect on the jury's decision. See U.S. v. Bentley, 561 F.3d 803, 810 (8th Cir. 2009) (finding no prejudice where the prosecutor followed the allege improper comments with an explanation that the government has the burden of proof; and the district court also instructed the jury that the defendant had the presumption of innocence, the government had the burden to prove all the essential elements of each charged crime, and the defendant had no burden to prove his innocence).

Next, this Court finds that no misconduct occurred when the prosecutor stated that it would be an "unspeakable injustice" to convict of a lesser included offense and that the jury should not be tempted "to compromise on justice." Citing to several similar cases in which there were allegation of similar claims of prosecutorial misconduct, the Minnesota Supreme Court concluded that the prosecutor's statements in the closing argument in the instant case did not constitute prosecutorial misconduct. See Jackson, 773 N.W.2d at 125 (citations omitted) and n.3.

The United States Supreme Court has held that "[p]rosecutors have a special duty to seek justice, not merely to convict." Connick v. Thompson, 131 S.Ct. 1350, 1362 (2011) (citations omitted) (internal quotation marks omitted); see also Young v. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 803 (1987) (citation omitted) ("The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict."). In this case, the prosecutor asked the jury not to minimize the Petitioner's actions, and "to search for and to do justice." Tr. 2516. These statements were not an attempt to disparage or belittle the defense's position, as Petitioner had

argued on appeal.  See Jackson, 773 N.W.2d at 125.  The prosecutor merely asked the jury to seek justice, as he himself was required to do.  This Court finds no prosecutorial misconduct by these statements, and therefore the Minnesota Supreme Court's ruling here was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of facts in light of the evidence presented at trial.  Moreover, these comments did not have had a substantial and injurious effect on the jury's decision.

The Minnesota Supreme Court also held that it was not misconduct when the prosecutor stated "Welcome to the real world of gangs and gang violence.  This is what happens on the streets of North Minneapolis."  Jackson, 773 N.W.2d at 124.  While Petitioner argued that such statements "inflamed the jurors' prejudices," the Minnesota Supreme Court disagreed stating:

> The prosecutor did not refer to any party or witness by race. The majority of the prosecutor's witnesses were gang members who had criminal records. The prosecutor was not demeaning, did not go on at length about the "gang world," and did not invite the jury to compare its own world to the world described. On this record, it was not misconduct for the prosecutor to comment about "the real world of gangs and gang violence."

Id.

Under federal law, "[a] prosecutor may not make an appeal to the jury that is 'directed to passion or prejudice rather than to an understanding of the facts and of the law.'"  U.S. v. Phillips, 664 F.2d 971, 1030 (5th Cir. 1981) (quoting U.S. ex rel. Perry v. Mulligan, 544 F.2d 674, 680 (3d Cir. 1976), cert. denied, 429 U.S. 972 (1977)), overruled on other grounds; see also Viereck v. U.S., 318 U.S. 236, 248 (1943) (finding that prosecutor's statement to jury concerning wartime duty was improper as it appealed

to jurors' passions). In this case, that did not happen and the Minnesota Supreme Court's decision on this issue is supported by the record. Nowhere in his discussion of gangs and gang violence did the prosecutor mention Petitioner's race or socioeconomic status. Tr. 2534, 2537, 2540. The statements that Petitioner has challenged were made during the prosecutor's explanation of motive – that Petitioner committed a crime for the advancement of a gang. Tr. 2533-34. The prosecutor's comments were meant to illustrate the reality of gang-related violence, not the personal characteristics of Petitioner himself. On this record, this Court finds that the Minnesota Supreme Court's ruling that the prosecutor's comments did not amount to misconduct was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of facts in light of the evidence presented at trial. Furthermore, even if these statements had some prejudicial effect on the jury, they must be considered in light of the strength of the State's evidence that Petitioner was the shooter of Lynch. <u>See</u> n. 24, <u>supra</u>. After weighing the possible effect of the prosecutor's statements against the evidence of Petitioner's guilt, this Court finds the prosecutor's comments did not have had a substantial and injurious effect on the jury's decision.[26]

In summary, this Court finds that the Minnesota Supreme Court's rulings with respect to Petitioner's challenges to the prosecutor's conduct during trial and in closing

---

[26] Petitioner also took issue with statements made by the prosecution that involved asking the jury whether they thought that defendants were boy scouts. Petition, p. 10. However, he did not raise this issue with the Minnesota Supreme Court, and therefore, it cannot be now be raised in a habeas petition to this Court. More critically, the Court could find no reference to boy scouts during the closing argument of the prosecutor. However, even if such a statement was made, it had no substantial and injurious effect on the jury's decision, particularly in light of the evidence presented against Petitioner. <u>See</u> n. 24, <u>supra</u>.

argument were not contrary to, or an unreasonable application of, clearly established federal law, nor was there an unreasonable determination of facts in light of the evidence presented at trial. Further, none of the questions and statements by the prosecutor had a substantial and injurious effect on the jury's decision. Therefore, Petitioner's claim that he was denied due process and a fair trial because of prosecutorial misconduct should be dismissed with prejudice.

E.    **Ground Five: Insufficient Evidence to Convict**

Ground 5 states that Petitioner's "due process rights were violated when he was convicted of committing a crime for the benefit of a gang despite insufficient evidence to satisfy all of the elements of the crime." Petition, p. 11. In response to this challenge on appeal, Respondent argued that it was moot. Jackson, 773 N.W.2d at 125. The Minnesota Supreme Court agreed. "Jackson was convicted of and sentenced for first-degree murder. Judgment of conviction was not entered for crime committed for the benefit of a gang, nor was Jackson sentenced for this offense. Because he was not convicted of or sentenced for crime committed for benefit of a gang, the issue of whether there was sufficient evidence to convict him on that count is moot." Id. (citations omitted).

Article III of the United States Constitution limits the jurisdiction of federal courts to deciding actual, ongoing "cases" and "controversies." See U.S. Const. art. III; Allen v. Wright, 468 U.S. 737, 750 (1984); Potter v. Norwest Mortgage, Inc., 329 F.3d 608, 611 (8th Cir. 2003). The Constitution forbids federal courts from addressing "questions that cannot affect the rights of litigants . . . and confines them to resolving real and substantial controvers[ies] . . . through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state

of facts." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990) (citations omitted) (internal quotation marks omitted).

To meet the "cases and controversies" requirement, Petitioner must show that "(1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." International Ass'n of Firefighters of St. Louis v. City of Ferguson, 283 F.3d 969, 973 (8th Cir. 2002) (internal quotation marks omitted) (quoting New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996)). Thus, the "cases and controversies" requirement is not met if the court is prevented from granting any meaningful relief to the requesting party. See In re Grand Jury Subpoenas Duces Tecum, 78 F.3d 1307, 1310 (8th Cir. 1996), cert. denied, 519 U.S. 980 (1996). If the court is unable to grant the requested relief, the case becomes moot, and the court loses jurisdiction to hear the case. See Calderon v. Moore, 518 U.S. 149, 150 (1996).

In the present case, Petitioner was convicted and sentenced to life imprisonment without the possibility of release for his conviction of first-degree murder only. Tr. 2729-30. In its discussion of sentencing, the trial court referenced State v. Martinez, 725 N.W.2d 733 (Minn. 2007); and State v. LaTourelle, 343 N.W.2d 277 (Minn. 1984). Tr. 2728. In Martinez, the Minnesota Supreme Court held that "'the proper procedure to be followed by the trial court when the defendant is convicted on more than one charge for the same act is for the court to adjudicate formally and impose sentence on *one count only.*'" Martinez, 725 N.W.2d at 739 (emphasis in original) (quoting LaTourelle, 343 N.W.2d at 284). Based on the authority of Martinez, the trial court sentenced Petitioner on the conviction of first-degree murder alone. Tr. 2729-30.

Petitioner does not contest the sufficiency of the evidence for the first-degree murder conviction. Consequently, even if this Court were to reverse Petitioner's conviction of committing a crime for the benefit of a gang, Petitioner's conviction of first-degree murder would stand, and he would remain imprisoned. This Court cannot provide any meaningful relief to Petitioner, and accordingly, Petitioner's claim that there was insufficient evidence to satisfy all of the elements of the crime is moot and should be dismissed with prejudice.

### F.  Ground Six: Violation of Sequestration Order

Ground 6 provides "[p]etitioner's right to a fair trial was violated when one Charles Pettis, a [S]tate witness was allowed to testify despite being present in the courtroom, in violation of a witness sequestration order, during the critical testimony of Jermaine Mack-Lynch." Petition, p. 13. Petitioner claimed, "Pettis . . . came into the courtroom and heard Mr. Mack-Lynch testify in violation of sequestration order." Id. Upon learning of Pettis' presence during Mack-Lynch's testimony, the trial court questioned Pettis on what he had heard and allowed defense counsel to question him. Tr. 1560-64.

On appeal, the Minnesota Supreme Court declined to overturn Petitioner's conviction because he had failed to show prejudice from the trial court's decision. See Jackson, 773 N.W.2d 127. Respondent similarly argued that a mistrial would be inappropriate here because Petitioner was not prejudiced by Pettis' violation, and he was allowed a full cross-examination of Pettis after the violation. See Resp. Mem., pp. 31-32. This Court agrees.

"[T]he trial court enjoys wide latitude to fashion the appropriate remedy for a [sequestration] violation. We review that [remedy] for an abuse of discretion." U.S. v.

Collins, 340 F.3d 672, 681 (8th Cir. 2003) (citations omitted).  In this case, Petitioner has not demonstrated how he was prejudiced by the violation of the sequestration order.  When questioned about what he had heard while Mack-Lynch was testifying, Pettis stated the following:

> I don't know exactly what he was speaking about, but the other two lawyers was speaking and they asked questions about who they think called the police or whatever and then Furnstahl got back up and I guess they asked him questions about where he seen them at or something like that.

Tr. 1561.  When given a chance to cross-examine Pettis, defense counsel merely confirmed the order in which Pettis had heard the attorneys speak.  Tr. 1561-62. Petitioner has not shown that the testimony Pettis overheard was relevant or injurious to his case.

"Since we too are unable to suggest any theory relevant to that inquiry, we hold that those actions were not so prejudicial as to call into question the fundamental fairness of [petitioner's] state trial. We therefore reject his allegation of a violation of his due process rights occasioned by the . . . failure to ensure the sequestration of [Pettis]." Ashker v. Class, 152 F.3d 863, 872-73 (8th Cir. 1998); see also U.S. v. Calderin-Rodriguez, 244 F.3d 977, 985 (8th Cir. 2001) (finding that witnesses communicating with each other in violation of sequestration order was not reversible error because defendant was not prejudiced); Poyner v. State of Iowa, 990 F.2d 435, 439 (8th Cir. 1993) (refusing to grant mistrial based on witness' admitted violation of sequestration order because defendant showed no prejudice).

This Court finds that the Minnesota Supreme Court's holding on the sequestration issue was neither contrary to established federal law nor an unreasonable determination of the facts in light of the evidence presented at trial.  Therefore,

Petitioner's claim that his due process rights were violated by Pettis' violation of the sequestration order should be dismissed with prejudice.

### G. Ground Seven: Refusal to Admit Evidence

Ground 7 states that "Petitioner was denied Due Process and his right to present a full defense in violation of his Sixth Amendment rights when the district court refused to allow him to present to the jury a videotape of the crime scene, taken right after the shooting, which contained favorable evidence regarding statements made by the [S]tate's main witnesses regarding the view the allegedly had of the shooters from the front steps of and front yard of 701 N. Thomas Avenue." Petition, p. 14. Petitioner explained:

> Petitioner attempted to introduce a video tape of the crime scene in which the maker of the video tape had walked from the front door of 701 N. Thomas Avenue to the backyard of 626 N. Thomas Avenue, where the victim's body and various shell casings were found . . . The district court refused to allow [p]etitioner to introduce the video tape because the police officer that shot the video was unavailable to testify at trial as he was out of town.

Id. According to Petitioner, the video showed that the locations of the eyewitnesses made it impossible for them to see what they claimed to have seen. Jackson, 773 N.W.2d at 126.

The Minnesota Supreme Court held that Petitioner's argument had no merit because photographs admitted into evidence showed the location of the witnesses, which gave Petitioner the means to argue the impossibility of the testimony of the eyewitnesses. Id. Respondent similarly argued that Petitioner had again failed to show he was prejudiced by the ruling. See Resp. Mem., pp. 32-33

"In a federal habeas petition, this Court may only review state evidentiary issues when 'the asserted error infringed a specific constitutional protection or was so prejudicial as to deny due process.'" McDonald v. Bowersox, 101 F.3d 588, 596-97 (8th Cir. 1996) (quoting Wallace v. Lockhart, 701 F.2d 719, 724 (8th Cir. 1983)), cert. denied, 521 U.S. 1127 (1997); see also Adail v. Wyrick, 711 F.2d 99, 102 ("Rules of evidence and trial procedure are usually matters of state law. A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process.").

In this case, Petitioner was not prejudiced by the trial court's decision to exclude Petitioner's video tape from evidence because the admitted evidence included photographs that showed everything that was on the video, rendering the videotape was redundant. Tr. 2131. Furthermore, defense counsel stipulated to the redundancy of the evidence, stating that it is "merely a better explanation to the jury of what this scene looked like." Tr. 2132. Thus, it was not impossible for Petitioner to make his argument without the use of the videotape, and the prejudicial effect, if any, was minimal.

Even assuming Petitioner was prejudiced by the trial court's decision, any error was not by the trial court. The videotape was taken by a Sergeant Timmerman who testified as a witness for the state before Petitioner sought to introduce the videotape. Tr. 2128. Petitioner did not introduce the videotape during Sergeant Timmerman's cross-examination. Id. Petitioner attempted to subpoena Sergeant Timmerman to testify about the video, but he was out of the office and did not receive notice.[27] Tr.

---

[27] The subpoena was delivered to Sergeant Timmerman's place of business on February 26, 2007, and his presence was scheduled for the next morning. Tr. 2129.

2129.  Petitioner's failure to introduce evidence during cross-examination does not constitute error on the part of the trial court.

The Minnesota Supreme Court's affirmance of the trial court's decision to exclude the videotape was not contrary to established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented at trial.  As such, Petitioner's claim that his due process rights were violated by the trial court's refusal to admit Petitioner's video tape into evidence should be dismissed with prejudice.

## III.     CERTIFICATE OF APPEALABILITY

The Court may grant a certificate of appealability only where a petitioner has made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2); Copeland v. Washington, 232 F.3d 969, 977 (8th Cir. 2000).  To make such a showing, the issues must be debatable among reasonable jurists, a court must be able to resolve the issues differently, or the issue must deserve further proceedings. See Flieger v. Delo, 16 F.3d 878, 882–83 (8th Cir. 1994).  The Court finds that another court would not decide the issues raised in this section 2254 motion differently.  For this reason, the Court concludes that Petitioner has failed to make the required substantial showing of the denial of a constitutional right, and the Court denies a certificate of appealability.

## IV.     RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.      Cornelius H. Jackson's Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 [Docket No. 1] be **DISMISSED WITH PREJUDICE**.

2.      Petitioner **SHOULD NOT** be granted a Certificate of Appealability.


Dated:        October 26, 2012


                                        s/ *Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge




**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 9, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.